```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
```

IN RE: NADER MODANLO        :

NADER MODANLO              :

    Appellant           :

    v.                  : Civil Action No. DKC 2006-0268

                        :

MICHAEL AHAN               :

    Appellee            :

                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution is a motion to disqualify Bradford Englander and the firm of Linowes & Blocher ("L&B") from representing Michael Ahan ("Ahan"), a creditor in the bankruptcy case of Nader Modanlo ("Debtor"), Case No. 05-26549-NVA.[1] The case is before this court on appeal from the Order of United States Bankruptcy Judge Nancy V. Alquist appointing a trustee upon the request of Ahan. Oral argument is deemed unnecessary because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See* Fed.R.Bankr.P. 8012. For the reasons that follow, the court will deny Debtor's motion to disqualify.[2]

---

[1] Debtor also has filed a motion to disqualify in the bankruptcy court.

[2] The court will address Debtor's appeal of the trustee appointment in a separate opinion.

**I.    Background**

   **A.    Factual Background**

Debtor has been involved in ongoing litigation over the management of two companies, Final Analysis, Inc. ("FAI"), and Final Analysis Communications Services, Inc. ("FACS"), which he founded with Ahan in the early 1990s. FAI is an engineering company. FACS was established to develop and operate a worldwide satellite telecommunications system. When FACS was formed, FAI owned 100% of FACS's voting shares.

Sometime in the late 1990s, disputes arose between Debtor and Ahan over the management and direction of the companies, and both partners accused the other of attempting to take control. In 2001, FAI filed an involuntary petition under Chapter 11 of the Bankruptcy Code; that case is still pending.[3] That same year, fourteen shareholders of FACS filed direct and derivative claims

---

[3] As part of FAI's bankruptcy, the bankruptcy court ordered FAI to sell its assets, which included a majority of the outstanding stock in FACS. A company owned by Debtor, New York Satellite, LLC, was the successful bidder for the stock. The purchase is the subject of continuing litigation.
   Mr. Englander was involved as counsel in the FAI bankruptcy case, although the nature of his involvement is not entirely clear. Mr. Englander states that he was "co-counsel" to a group of shareholders involved in the FAI bankruptcy (paper 9, ex. 1, ¶ 3), although the bankruptcy court's records do not list him as an attorney of record for the parties. The parties disagree over the level of Mr. Englander's involvement, apparently because Ahan argues that Debtor should have known of Mr. Englander's conflicts and Debtor "assumed the risk." (Paper 9, at 14). The court need not address this issue, however, in order to resolve Debtor's disqualification motion.

against FACS, FAI, and Debtor in the Circuit Court for Montgomery County, alleging misappropriation, fraud, and breach of fiduciary duty on the part of Debtor and FAI.  The circuit court bifurcated the litigation and both parts proceeded to trial.  The first part was tried in May 2003, and the jury found against Debtor and FAI on claims involving fraud, misappropriation of corporate funds, and breach of fiduciary duty; a judgment of $3.15 million was entered in Montgomery County Circuit Court.[4]  The second part went to trial and on October 22, 2004, a jury found that Debtor had breached a fiduciary duty owed to Ahan, and awarded Ahan $103.93 million.  On July 14, 2005, Circuit Court Judge Michael D. Mason held a hearing during which he ordered Debtor to file a $1 million bond while Debtor appealed the $103.9 million judgment.  Judge Mason stayed his order for ten days.  On July 22, 2005, Debtor filed a petition under Chapter 11 of the Bankruptcy Code.

Debtor's motion to disqualify relates to events during the period between the July 14, 2005, hearing and the date Debtor filed for bankruptcy.  During the week of July 18, 2005, Sharon Edwards, a consultant of FACS who previously worked for FAI, contacted a number of law firms in an effort to secure a bankruptcy attorney for Debtor personally.[5]

---

[4] The status of appeals involving this verdict is not clear from the papers.

[5] The record does not reflect how many firms she contacted.
(continued...)

3

Among the law firms with which Ms. Edwards had telephone conversations was L&B.  Ms. Edwards spoke with two attorneys at L&B.  She spoke briefly with James A. Vidmar, but had to end the phone call when she received another call.  She spoke more extensively with Paul Sweeney.[6]  In an affidavit, Ms. Edwards states that during the conversations, she discussed the history of the formation and corporate structure of FAI and FACS, the litigation in Montgomery County Circuit Court, the parties involved in the dispute as well as their attorneys, that the Debtor's legal strategy was to enter personal bankruptcy, and Debtor's assets and liabilities.  Mr. Sweeney asked her why Debtor had waited to locate counsel and why Debtor had not called him personally.

> I said we had not waited, we began as soon as we could after the judge's ruling, but that Mr. Modanlo - and I and all of our office - have been consumed in getting ready for a federal trial of a suit FACS had filed against General Dynamics asking for $500 million in

---

[5](...continued)
Given the multiplicity of parties often involved in bankruptcy litigation, it would be particularly unfortunate if a "prospective client" managed to disqualify a large number of firms from representing other parties by contacts such as were made in this case.

[6] In her first affidavit, Ms. Edwards states that she spoke "at length" with Mr. Vidmar during two conversations. (Paper 5, ex. 1, ¶ 6).  Mr. Vidmar disputes that Ms. Edwards spoke at length with him, and Mr. Sweeney states that he is the attorney with whom Ms. Edwards spoke in detail.  (Paper 9, ex. 2, ¶¶ 4-11).  In Debtor's reply, Ms. Edwards states that she had both Mr. Vidmar's and Mr. Sweeney's names written in her notes, but "could not specifically recall whether or not I had spoken to Mr. Sweeney." (Paper 16, ex. 1, ¶ 1).

4

> damages, and that the trial, slated for six or seven weeks, began July 19. Because Mr. Modanlo was our star witness, he could not take the time way from trial preparation to call counsel himself, but he expected that all conversations with me on his behalf would be confidential.

(Paper 5, ex. 1, at ¶ 15).

Ms. Edwards further states that Mr. Sweeney called her back and he agreed to take the case, however Debtor would need to provide a large retainer. She told Mr. Sweeney that because Debtor was in "dire financial shape," she did not believe he could raise such a large retainer on such short notice, but that she would get back with him if Debtor wished to speak to him further.

Mr. Sweeney gives a different version on this phone call:

> Given the poor prospects for payment and the decisions rendered by the Court against Mr. Modanlo, I did not desire to "qualify" for an interview or proceed further with the discussion. I told her that while I had substantial experience that would make me well-qualified, it was not a case that would be considered unless the Debtor was prepared to put up a six figure retainer.

(Paper 9, ex. 3, ¶ 8).

Ms. Edwards reported the results of her search to Debtor, although she did not report to him the name of every firm she contacted. She only gave him the names of firms that passed her initial screening, which did not include L&B.

On December 20, 2005, Ms. Edwards attended a bankruptcy court hearing and noted Mr. Englander's representation, although she did

not know the name of his firm.  She did not become aware of his relationship to L&B until January 31, 2006, when she looked more closely at the cover page of a hearing transcript relating to the December 20 hearing.  After confirming that Mr. Englander was at the same firm as Mr. Vidmar and Mr. Sweeney, she immediately informed Debtor of her discovery.

   **B. Procedural Background**

Debtor filed his Chapter 11 petition on July 22, 2005.  On September 7, 2005, Mr. Englander entered his appearance on behalf of Ahan.  On November 23, 2005, Ahan filed a motion to appoint a Chapter 11 trustee, which Judge Alquist granted on December 23, 2005.  Debtor filed an appeal to this court.  On February 15, 2006, Debtor filed a motion with both this court and the bankruptcy court seeking to disqualify Mr. Englander and L&B pursuant to Rule 1.18 of the Maryland Rules of Professional Conduct ("MRPC").

**II.  Standard of Review**

As aptly stated by Judge Andre Davis in *Zachair, Ltd. v. Driggs*, 965 F.Supp. 741, 750 (D.Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998):

> A motion to disqualify is a "serious matter," *Plant Genetic Systems* [*N.V. v. Ciba Seeds*], 933 F.Supp. [514,] at 517 [(M.D.N.C. 1996)], which must be decided on a case-by-case basis.  *See Buckley v. Airshield Corp.*, 908 F.Supp. 299, 304 (D.Md. 1995).  This is so because two significant interests are implicated by a disqualification motion: "the client's free choice of counsel and the maintenance of the highest ethical and

> professional standards in the legal community." *Tessier* [*v. Plastic Surgery Specialists, Inc.*], 731 F. Supp. [724] at 729 [(E.D.Va. 1990)]; *Buckley*, 908 F.Supp. at 304. Nevertheless, "the guiding principle in considering a motion to disqualify counsel is safeguarding the integrity of the court proceedings." *Plant Genetic Systems*, 933 F.Supp. at 517; *see Hull v. Celanese Corporation*, 513 F.2d 568, 572 (2nd Cir. 1975)(finding that a party's free choice of counsel must yield to "considerations of ethics which run to the very integrity of our judicial process."). Thus, this court must not weigh the competing issues "with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing an appearance of impropriety, [this Court] is to resolve all doubts in favor of disqualification." *United States v. Clarkson*, 567 F.2d 270, 273 n. 3 (4th Cir. 1977)(internal quotation marks and citations omitted); *Rogers v. Pittston Co.*, 800 F.Supp. 350, 353 (W.D.Va. 1992); *Buckley*, 908 F.Supp. at 304.

There is no unalterable procedure for assessing a disqualification motion. Some courts state that "the method of conducting the inquiry is within the discretion of the judge . . . ." *Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136, 1140 (2nd Cir. 1975)(quoted in *United States v. Philip Morris Inc.*, 312 F.Supp.2d 27, 34 (D.D.C. 2004), *vacated in part on other grounds*, 220 F.R.D. 109 (2004)). Judge Kessler also observed:

> [T]he courts have focused on the need for an adequate record for appellate review, rather than any precise form or scope of discovery. *See General Mill Supply Co. v. SCA Services, Inc.*, 697 F.2d 704, 710 (6th Cir. 1982)(stating that "an evidentiary hearing need not occur in every such [disqualification] motion," but that the factual inquiry must be conducted in

7

> a manner which will allow appellate review); *McKinney v. McMeans*, 147 F.Supp.2d 898, 900 (W.D.Tenn. 2001)(finding that "although it need not hold an evidentiary hearing, the court must satisfy itself that an adequate record exists permitting later appellate review").

*Philip Morris*, 312 F.Supp.2d at 34-35. She concluded:

> In short, as long as the trial court concludes that there will be an adequate record for appellate review, whether in the form of affidavits, documents, or submissions *in camera*, the court may in its discretion decide whether discovery is either warranted or inappropriate. Indeed, as far back as 1860, the Supreme Court ruled that in proceedings charging unprofessional conduct, the manner in which the proceeding was to be conducted, "so that it was without oppression or unfairness, was a matter of judicial regulation." *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 540, 19 L.Ed. 285 (1868).

*Id.* at 35.

### III. Analysis

Under Local Rule 704, this court applies the MRPC as they have been adopted by the Maryland Court of Appeals. Rule 1.18 of the MRPC provides:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.
>
> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

8

>   (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).
>
>   (d) Representation is permissible if both the affected client and the prospective client have given informed consent, confirmed in writing, or the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

The Court of Appeals of Maryland adopted Rule 1.18 on February 8, 2005, and it went into effect July 1, 2005. The Comments to this rule explain that:

>   [1] Prospective clients, like clients, may disclose information to a lawyer, place documents or other property in the lawyer's custody, or rely on the lawyer's advice. A lawyer's discussions with a prospective client usually are limited in time and depth and leave both the prospective client and the lawyer free (and sometimes required) to proceed no further. Hence, prospective clients should receive some but not all of the protection afforded clients.
>
>   [2] Not all persons who communicate information to a lawyer are entitled to protection under this Rule. For example, a person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming

9

>     a client-lawyer relationship, is not a
>     "prospective client" within the meaning of
>     paragraph (a).

MRPC R. 1.18 cmt. (2006). Thus far, there are no reported opinions interpreting Rule 1.18.

Debtor argues that Mr. Englander and L&B should be disqualified from serving as counsel to Ahan because Debtor is a prospective client and subsection (c) prohibits Englander and L&B from representing a client "with interests materially adverse to those of a prospective client in the same or a substantially related matter." Rule 1.18(c). Ahan responds that Debtor was not a prospective client within the meaning of Rule 1.18 and that any information relayed to Mr. Sweeney was not "significantly harmful."

### A. Prospective Client

Debtor contends that he is a prospective client because Ms. Edwards was acting as his agent when she spoke with Mr. Sweeney, and her purpose was to discuss the possibility of L&B representing him. (Paper 5, at 5). Ahan argues that Debtor was not a prospective client because Debtor did not personally have the conversation with Mr. Sweeney, but instead communicated through Ms. Edwards, and the purpose of the communication was not to obtain legal advice but to set up interviews for Debtor. (Paper 9, at 12). Debtor states in his reply memorandum that the fact that he used an intermediary does not change the analysis (paper 16, at 5), and he proffers a supplemental affidavit in which Ms. Edwards

10

clarifies that her role was more substantive than setting up interviews (paper 16, ex. 1, at ¶ 9).

Subsection (a) does not explicitly address circumstances in which an individual uses an intermediary to help secure legal counsel. The Court of Appeals of Maryland has not addressed this issue with respect to Rule 1.18 or any other MRPC rules. Courts in other jurisdictions, however, have recognized the ability of a client (or prospective client) to communicate with an attorney through a third party. The issue typically arises in cases in which a corporate client claims that conversations with an attorney that were made through or with the assistance of an intermediary are confidential and privileged. *See, e.g., In re Grand Jury Proceedings Under Seal,* 947 F.2d 1188, 1191 (4th Cir. 1991)(stating that "communications by the client's agent to the attorney are privileged" and holding that communications with an accountant for the purpose of assisting the client in the rendition of legal services are protected); *In re Bieter Co.*, 16 F.3d 929, 940 (8th Cir. 1994)(finding that conversations between the client's attorney and the client's independent consultant, who was intimately involved in the litigation and who at times was the client's sole representative at meetings with attorneys, were privileged); *Neighborhood Dev. Collaborative v. Murphy*, 233 F.R.D. 436, 441 (D.Md. 2005)(finding that communications between a client and his attorney, which were conducted through a third-party financial

11

consultant, were made for the purpose of obtaining legal advice and were confidential).  There are also some instances in which non-corporate individuals have communicated with their attorney through or with the assistance of an intermediary for their personal litigation.  *See, e.g., Bendict v. Amaducci*, No. 92 CIV. 5239 (KMW), 1995 WL 23555, at *1 (S.D.N.Y. Jan. 20, 1995)(finding that communications with a third party, who assisted the plaintiffs on financial matters and with their litigation, were made for the purpose of obtaining or consulting with attorneys, and therefore were protected by the attorney-client privilege); *Harkobusic v. Gen. Am. Transp. Corp.*, 31 F.R.D. 264, 266 (W.D.Pa. 1962)(finding that a brother-in-law was acting as the plaintiff's agent when he and the plaintiff communicated with attorneys in an effort to seek legal advice and those communications were privileged); *Stroh v. Gen. Motors Corp.*, 623 N.Y.S.2d 873, 874 (N.Y.App.Div. 1995)(finding that an elderly woman's daughter acted as the woman's agent in selecting a law firm to represent her, transporting her to the law office, and putting her mother at ease so she could communicate effectively with counsel).

Debtor has not established clearly that Ms. Edwards qualifies as an intermediary acting on his personal behalf, as opposed to continuing her role on behalf of FACS. Ms. Edwards states in her affidavit that in her work with FACS:

> I have been very involved with interviewing and locating counsel, participating in

12

> regulatory and legal strategy formation and execution, performing discovery and document analysis, debating and participating in meetings with counsel regarding litigation, deposition, and trial strategy, formulating matrixes of documentary evidence, designating deposition excerpts to be read at trial, selecting trial exhibits, engaging in settlement strategy discussions, commenting on, drafting, and editing pleadings both regulatory and litigation, and participating in mediation meetings.

(Paper 16, ex. 1, ¶ 9).  The difficulty is that although Ms. Edwards states she is a *consultant for FACS*, the present issue involves her search for counsel for *Debtor's personal bankruptcy* case.

Even if Debtor succeeded on this point, however, Debtor's motion would fail for a different reason.  If Ms. Edwards was Debtor's agent, then her actions as his agent – and her knowledge of whom she spoke with – would be imputed to Debtor.  *See Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771 (4th Cir. 1995)(citing *Balt. Am. Ins. Co v. Ulman*, 165 Md. 630 (1934); *Schwind v. Boyce*, 94 Md. 510 (1902)); *Henley v. Prince George's County*, 305 Md. 320, 340 (1986).  Thus, as of September 7, 2005, when Mr. Englander filed his notice of appearance in the bankruptcy case, Debtor is charged with knowledge of the potential conflict.  Yet Debtor did not file the motion to disqualify with this court until February 15, 2006.  To the extent that Ms. Edwards' knowledge is imputed to Debtor, Debtor's failure to file a motion to disqualify in a more timely manner raises the issue of waiver.

Courts have held that a party may waive its objection to a conflict of interest by failing to file timely a motion to disqualify. *See Cassidy v. Lourim*, 311 F.Supp.2d 456, 461 & n.11 (D.Md. 2004); *Buckley v. Airshield Corp.*, 908 F.Supp. 299, 307 (D.Md. 1995). "[T]he mere length of the delay is not dispositive and the Court should not deny a motion to disqualify based on delay alone." *Buckley*, 908 F.Supp. at 307. The *Buckley* court suggested additional factors that a court should consider:

> [W]hen the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and in particular, whether the motion was delayed for tactical reasons; and whether the disqualification would result in prejudice to the nonmoving party.

*Id.*(quoting *Employers Ins. of Wausau v. Albert D. Seeno Constr. Co.*, 692 F.Supp. 1150, 1165 (N.D.Cal. 1988)).

In the present case, Debtor learned of Mr. Englander's representation on September 7, 2005, but filed his motion to dismiss more than five months later.[7] During this period, Debtor was represented by counsel. Moreover, a delay in Debtor's bankruptcy case would be to the tactical advantage of Debtor, who

---

[7] Other cases in which courts found a waiver of the conflict issue involved delays longer than the delay in the present case. *See, e.g., Cent. Milk Producers Co-op. v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978)(more than two years); *Gross v. SES Americom, Inc.*, 307 F.Supp.2d 719 (D.Md. 2004)(two years); *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099)(D.N.J. 1993)(three years). As discussed previously, however, the length of the delay is just one factor the court considers.

is appealing the $103.93 million judgment against him in Montgomery County Circuit Court.  Debtor has asked the bankruptcy court to allow him an extension of time to file a reorganization plan so that he can pursue his appeal and have a final resolution on the Montgomery County judgment before filing the plan.  In addition, Ahan would be prejudiced by the disqualification of Mr. Englander and L&B, particularly because of the long and complex history of litigation relating to the FAI and FACS companies, and Mr. Englander's prior involvement.  Thus, Debtor has waived this issue.

Moreover, Debtor has not shown that any information shared with L&B qualifies as significantly harmful.  He speculates that Ms. Edwards may have provided information that is useful to Ahan: "Was information at variance with the schedules disclosed?  What valuation did Modanlo place on his assets?  What did he hope to accomplish?" (Paper 5, at 7).  There is no evidence in Ms. Edwards' two affidavits, however, that she provided information to Mr. Sweeney that was at variance with the schedules Debtor filed in his bankruptcy case.  There is also no evidence that she gave Mr. Sweeney a specific value to Debtor's assets, or that she specifically told him what Debtor hoped to accomplish in filing for bankruptcy.  These perceived harms are simply too speculative to support a disqualification.[8]  Moreover, as a practical matter,

---

[8] Indeed, the fact that Ms. Edwards did not advise Debtor of the full nature of her asserted communications with L&B undercuts
(continued...)

15

there is no evidence – or allegation – that Englander or L&B has been able to use any confidential information to Debtor's disadvantage.  In other words, even assuming that Ms. Edwards relayed confidential information, there is no suggestion that Mr. Sweeney has revealed this information to Mr. Englander and that Ahan has benefitted therefrom.

The United States Court of Appeals for the Fourth Circuit has held that a motion to disqualify cannot be based on "a fanciful, unrealistic or purely subjective suspicion of impropriety." *United States v. Smith*, 653 F.2d 126, 128 (4th Cir. 1981).  *See also Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992), *cert. denied*, 506 U.S. 1021 (1992); *Aetna Cas. & Sur. Co v. United States*, 570 F.2d 1197, 1201 (4th Cir. 1978), *cert. denied*, 439 U.S. 821 (1978).  Moreover, in considering disqualification, the court must take "practical considerations" into account.  *See Shaffer*, 966 F.2d at 146.  In *Aetna Casualty & Surety Co v. United States*, the Fourth Circuit quoted with approval an *amici curiae* brief by

---

$^{8}$(...continued)
any current assertion that significantly harmful confidential information was shared.  It strains credulity to suggest that Ms. Edwards, a self-described intimate in the inner workings of FACS, would fail to appreciate the need to advise Debtor of the identities of all attorneys to whom she had revealed such sensitive information.  By the same token, if Debtor had authorized her to reveal otherwise sensitive confidential information on his behalf, he surely would have wanted to know the identities of all attorneys who received the information.  For that reason as well, Debtor's assertion that significantly harmful information was discussed lacks force.

16

the Connecticut Bar Association filed in another disqualification case:

> It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.

570 F.2d at 1202.

Accordingly, the court will deny Debtor's motion to disqualify Mr. Englander and the firm of L&B from representing Ahan. Out of an abundance of caution, and because Mr. Sweeney has not been involved, and to ensure that no harmful information is disclosed in the future, the court further orders L&B formally to screen Mr. Sweeney from any participation in Debtor's personal bankruptcy case, Case No. 05-26549-NVA.

## IV. Conclusion

For the reasons stated above, the court will deny Debtor's motion to disqualify Mr. Englander and L&B. A separate Order will follow.

                                                    /s/
                               DEBORAH K. CHASANOW
                               United States District Judge